UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBROY WALL JR., <br><br>                     Petitioner, <br><br> vs. <br><br> WARDEN DAVIS, <br><br>                    Respondents. | Case No. 1:21-cv-00445-DCN <br><br> **MEMORANDUM DECISION AND ORDER** |

Petitioner Robroy Wall Jr. is proceeding on his Amended Petition for Writ of Habeas Corpus challenging his state court criminal conviction. Dkt. 13. Pending before the Court are various motions filed by the parties, including Respondent's superseding Motion for Summary Dismissal on statute of limitations and procedural default grounds, which is now fully briefed and ripe for adjudication. Dkts. 21, 24, 25, 26. Having reviewed the record and the parties' briefing in this case, the Court enters the following Order.

## PRELIMINARY MOTIONS

In the Initial Review Order, Petitioner was ordered to file an amended petition within 30 days. Dkt. 8. Petitioner did not, and Respondent filed a Motion to Dismiss for lack of prosecution several months after Petitioner's deadline had passed. Dkt. 10. In response, Petitioner filed an Amended Petition and a Motion to Reconsider Dismissal. Dkts. 13, 14.

Petitioner asserts that he did not receive the Initial Review Order and therefore could not comply with the deadline. Good cause appearing, the Court will accept the late filing of the Amended Petition and deny the original Motion for Summary Dismissal for Lack of Prosecution, because Petitioner again began to prosecute his case before any dismissal order was entered.

Respondent subsequently filed a Motion to Summarily Dismiss the Amended Petition. Dkt. 21. In conjunction with that Motion, the parties filed a Motion for Extension of Time and two Motions to File Excess Pages. Dkts. 18, 23, 28. Good cause appearing, the Court will grant those motions.

<strong>REVIEW OF MOTION FOR SUMMARY DISMISSAL</strong>

Respondent asserts that the original Petition in this action was filed beyond the one-year statute of limitations deadline, making the Amended Petition untimely, and that Petitioner cannot show adequate legal excuse to permit the Amended Petition to be adjudicated on the merits.

**1.  Statute of Limitations Standard of Law**

Petitioner's federal challenge to his state court criminal judgment is governed by Title 28 U.S.C. § 2254 and other associated statutory provisions that were amended by the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA). This statute requires a federal habeas corpus petition to be filed within one year from several triggering dates specified in 28 U.S.C. § 2244(d)(1)(A)-(D). *One year* means 366 days, for example, from January 1, 2000, to January 1, 2001. *See Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001) (applying Federal Rule of Civil Procedure 6(a) to AEDPA).

The most common triggering event is the first one, "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). That date can be calculated as follows.

| **Action Taken** | **Finality Occurs** |
|---|---|
| No appeal is filed after state district court order or judgment | 42 days later, *see* Idaho Appellate Rule 14 |
| Appeal is filed and Idaho Court of Appeals issues a decision, but no petition for review is filed with the Idaho Supreme Court | 21 days later, *see* Idaho Appellate Rule 118 |
| Appeal is filed and Idaho Supreme Court issues a decision or denies a petition for review of an Idaho Court of Appeals decision, and Petitioner does not file a petition for writ of certiorari with the United States Supreme Court | 90 days later, *see* United States Supreme Court Rule 13 |
| After Idaho Supreme Court issues a decision or denies a petition for review, Petitioner files a petition for writ of certiorari to the United States Supreme Court, and the petition is denied | Date of denial |
| After Idaho Supreme Court issues a decision or denies a petition for review, Petitioner files a petition for writ of certiorari to the United States Supreme Court, the petition is granted, and the United States Supreme Court issues a decision | Date of decision |

In each instance above, "finality" is measured from entry of the final judgment or order, not from a remittitur or mandate, which are mere formalities. *Gonzales v. Thaler*, 565 U.S. 134, 149-150 (2012); *Clay v. United States*, 537 U.S. 522, 529 (2003); *Wixom v. Washington*, 264 F.3d 894, 898 n.4 (9th Cir. 2001).

AEDPA also contains a tolling provision that stops or suspends the one-year limitations period from running during the time in "which a properly filed application for

State postconviction or other collateral review . . . is pending." 28 U.S.C. § 2244(d)(2). Because this particular statutory provision applies only to "pending" actions, the additional 21-, 42- and 90-day time periods associated with the calculation of finality after direct appeal are *not* applied to extend the tolling periods for post-conviction actions. However, unlike direct appeal "finality," the term "pending" *does* extend through the date of the remittitur.[1]

The federal statute is *not* tolled between the date the direct appeal is "final" and the filing of a proper post-conviction application, or between post-conviction finality and any successive collateral review petition. *Id*. Each time statutory tolling ends, the statute of limitations does not restart at one year, but begins running at the place where it stopped before the post-conviction action was filed.

Once a federal statute of limitations has expired, it cannot be reinstated or resurrected by a later-filed state court action. *See Ferguson v. Palmateer*, 321 F.3d 820, 822 (9th Cir. 2003) ("section 2244(d) does not permit the reinitiation of the limitations period that has ended before the state petition was filed").

## 2. Background

On May 5, 2003, the state of Idaho filed a Complaint charging Petitioner, Jason McDermott, and Daniel Hosford with first degree murder in the execution-style death of Zachariah Street. State's Lodging A-1, pp. 33-35. After hearing McDermott say that he

---

[1] *See Lawrence v. Florida*, 549 U.S. 327, 337 (2007). "Pending" is determined according to each particular state's law. In Idaho, an appellate case remains pending until a remittitur is issued. *See Cochran v. State*, 133 Idaho 205, 206, 984 P.2d 128, 129 (Idaho Ct. App. 1999).

planned to kill Street for being a "snitch," Petitioner and Hosford had accompanied McDermott on a late-night drive, where he picked up Street, drove to a desert area near Boise, made Street disrobe and kneel, and then shot Street in the head in the presence of Petitioner and Hosford. At the urging of McDermott, Petitioner fired a second shot into Street's head when Hosford refused to do so. Police arrested Hosford first, who implicated McDermott and Petitioner.

On April 20, 2005, after a jury trial in a criminal action in the Fourth Judicial District Court in Ada County, Idaho, Petitioner was convicted of the charge of first degree murder of Zacharias Street and use of a firearm in commission of the murder, but acquitted on the charge of conspiracy to murder. State's Lodging A-4, p. 1476. On June 7, 2005, Judge Darla Williamson entered a judgment requiring Petitioner to serve a fixed sentence of 25 years of imprisonment, with an indeterminate life term to follow, for first degree murder of Zacharias Street. State's Lodging A-3, pp. 85-87. On direct appeal, the Idaho Court of Appeals affirmed Petitioner's convictions and sentences. State's Lodging B-4. Petitioner filed a petition for review with the Idaho Supreme Court that was denied on August 4, 2010. State's Lodgings B-5, B-6, B-7.

Petitioner filed a pro se petition for post-conviction relief on April 5, 2011 (mailbox rule date).[2] State's Lodging C-1, pp. 6-12. The state post-conviction court appointed

---

[2] *See Houston v. Lack*, 487 U.S. 266 (1988) (in § 2254 context, a legal document is deemed filed on the date a prisoner delivers it to the prison authorities for filing by mail, rather than the date it is actually filed with the clerk of court. However, if the prisoner uses a U.S. Postal Service repository rather than handing the filing to prison officials, he is not entitled to the mailbox rule). In this case, Petitioner's mailing certificate shows that he use the "prison mailing system," to which the mail box rule would apply. State's Lodging C-1, p. 10.

conflict counsel Paul R. Taber III to represent Petitioner. *Id*., pp. 35-36. The State filed an answer to the petition, after which the state district court entered a notice of intent to dismiss; the clerk of court mailed the notice to both Taber and Petitioner on May 17, 2011.[3] *Id*., pp.42-52. A response was due within 20 days of the notice. *Id*. at 51. On June 1, 2011, Taber filed a motion requesting more time to respond, which the court granted. *Id*., pp. 53-55.

Taber never filed a response or additional request for extension of time. The state district court dismissed the petition on November 4, 2011, on grounds that Petitioner had not "presented prima facie evidence as to each element of the claims." *Id*., p. 58.

Nearly five years later, on June 24, 2016 (mailbox rule date), Petitioner contested the dismissal of his post-conviction action by filing a pro se notice of appeal and notice for re-hearing on the order of dismissal of the state post-conviction. *Id*., pp. 60-62.

Because the 2016 notice of appeal from the 2011 denial of post-conviction relief was untimely, the Idaho Supreme Court dismissed the appeal on August 31, 2016. State's Lodging D-2. The remittitur was issued on September 22, 2016. State's Lodging D-3.

As to the 2016 request for rehearing, Petitioner requested and was appointed new counsel, Ada County Public Defender Jonathan Loschi, who filed a Rule 60(b)(6) motion for relief from final judgment on November 29, 2016. The motion was accompanied by a supporting affidavit from Petitioner showing that, by 2014, Taber essentially had stopped

---

[3] Judge Darla Williamson's Notice of Intent to Dismiss was signed in typed text "May 9, 2010." State's Lodging C-1, p. 51. However, it is clear from the mailing certificate and all contemporaneous filings that the date should have been 2011, not 2010. *Id*., p. 52.

communicating with Petitioner about his post-conviction case and had filed nothing further in the post-conviction case after receiving the 2011 notice of dismissal. *Id*., pp. 63-67, 74-79, 81-83.

Ada County Fourth Judicial District Judge Lynn Norton heard argument on the Rule 60(b) motion. The court refused to consider hearsay statements allegedly made by Taber contained in Petitioner's supporting affidavit,[4] but accepted "Petitioner's assertions that Taber continued to visit him and accept calls until mid-2014." State's Lodging C-1, p. 120. However, because Petitioner knew of the dismissal in November 2011 and did not move for relief from dismissal until 2016, Judge Norton concluded: "Petitioner has not made a sufficient showing that the delay in filing this motion was reasonable even if incarcerated." *Id*., p. 4.

Judge Norton alternatively found that the substance of Petitioner's post-conviction petition "would not survive a motion for summary dismissal" for the reasons set forth in the earlier notice of intent to dismiss, and noted that Petitioner's then-current counsel had not filed a proposed amended petition, any additional supporting affidavits (such as one from Taber), or other materials in support of the petition. *Id*., pp. 117-21.

Petitioner was granted new counsel, Greg Silvey, on appeal of the Rule 60(b) motion. *Id*., pp. 126-27. Thereafter, Petitioner requested that Silvey be permitted to withdraw so that he could represent himself on appeal. State's Lodgings E-1, E-2, E-3. In

---

[4] Petitioner averred that he questioned Taber about dismissal, and Taber told him that "[they] had plenty of time to file other things in [Petitioner's] case and that [Taber] was waiting for [Petitioner] to get a new judge." State's Lodging C-1, p. 101. Petitioner specifically told Taber that Petitioner wanted to readdress the dismissal through a motion or an appeal; Taber assured Petitioner that Taber was working on Petitioner's case. *Id*.

his pro se opening brief, Petitioner contended that the performance of all of his prior attorneys had been "below that of competent counsel by not interviewing witnesses, investigating evidence, presenting a case in chief, scrutinizing [the] state's case in chief thoroughly and in some instances nothing at all to also include evidence suppression motions." State's Lodging E-4, p. 2. The Idaho Court of Appeals affirmed the denial of Rule 60(b)(6) relief. State's Lodging E-7. The Court of Appeals determined that the Rule 60(b)(6) motion was not filed within a reasonable time under state law, reasoning that, "[e]ven accepting his statement that his post-conviction counsel misled Wall regarding representation and the filings in his post-conviction case during their intermittent communications until the middle of 2014, there was still a two-year delay after his counsel stopped visiting or taking calls." *Id.*, p. 3. Alternatively, the appellate court affirmed the district court's decision on the merits of the 60(b) motion: "Petitioner's allegations regarding counsel's failure to respond to the notice of intent to dismiss and misleading communications do not rise to the level of unique and compelling circumstances" found in *Eby* [*v. State*, 228 P.3d 998 (Idaho 2010)]. *Id.*

Petitioner filed a petition for review in the Idaho Supreme Court, arguing that the law should not place the burden on an accused (who has no legal education) to defend himself or herself in a 'timely fashion in fact in any fashion at all'" and asking the court to relieve him of the time bar based on attorney conduct. State's Lodging E-13, pp. 1-2. The petition for review was denied on October 2, 2018, and the remittitur was issued the same day. State's Lodgings E-14, E-15.

MEMORANDUM DECISION AND ORDER - 8

On July 17, 2019 (mailbox rule date), Petitioner filed a successive petition for post-conviction relief. State's Lodging F-1, pp. 13-108. The post-conviction court issued a notice of intent to dismiss, indicating the successive petition would be dismissed because: (1) the claims could have been raised in Petitioner's direct appeal and/or the first post-conviction petition; (2) the petition was untimely; and (3) the "new evidence" submitted by Petitioner was merely based upon the original trial discovery and excerpts of the trial transcript and could not support a claim of "actual innocence" under I.C. § 19-4901(a)(4). State's Lodging F-1, pp. 127-36. Petitioner filed a response, but the district court dismissed the successive petition. *Id*., pp. 137-39, 141-49.

Petitioner filed a pro se appeal, raising only the following issue: "Whether the district court committed reversible error by dismissing the appellant's successive post-conviction when it clearly shows neglect by counsel at every stage of this case, plus appellant's successive post-conviction shows a meritorious defense." State's Lodging G-1, p. 7. The Idaho Court of Appeals affirmed dismissal of the successive petition, concluding the post-conviction court properly rejected Petitioner's claims based upon Idaho Code § 19-4908 and *Murphy v. State*, 327 P.3d 365, 371 (2014), and because Petitioner failed to challenge the post-conviction court's second and third reasons for dismissal: timeliness and failing to present new evidence to support his actual innocence claim. State's Lodging G-4, p. 2 & n. 2-3.

Because Petitioner did not seek review by the Idaho Supreme Court, the Idaho Court of Appeals issued the Remittitur issued March 30, 2021. State's Lodging G-5. Petitioner did not file a petition for a writ of certiorari with the United States Supreme Court after his

direct appeal.

On November 4, 2021 (mailbox rule date), Petitioner filed his pro se Petition for Writ of Habeas Corpus in this action. Dkt. 3.

### 3. Discussion of Timeliness

Petitioner's judgment became final on November 2, 2010, which is 90 days after the Idaho Supreme Court denied his petition for review after direct appeal. His federal habeas corpus statute began running on that date, with 366 days remaining.

Petitioner filed his first post-conviction petition on April 5, 2011, which tolled or stopped the federal state statute of limitations. At that point, 154 days of his federal statute of limitations period had elapsed, with 212 days remaining. The statute of limitations remained tolled only through the date of finality of the dismissal of the original post-conviction petition in the district court on November 4, 2011, because the appeal filed in 2016 was determined to be untimely. The law is clear that, if "the state court rejected petitioner's PCRA petition as untimely, it [is] not "properly filed," and [the petitioner] is not entitled to statutory tolling under § 2244(d)(2)." *Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2005). Finality for Petitioner occurred 42 days after November 4, 2011, which was on December 16, 2011, pursuant to Idaho Appellate Rule 14. On that date, his federal statute of limitations started again with 212 days remaining.

Petitioner's statute of limitations ran uninterrupted until it expired on Monday, July 16, 2012. He filed a late notice of four years later, on June 24, 2016. However, a late notice of appeal in state court is not a proper filing and does not toll the federal statute. *See Evans v. Chavis*, 546 U.S. 189, 197 (2006) ("only a timely appeal tolls AEDPA's 1-year

limitations period for the time between the lower court's adverse decision and the filing of a notice of appeal").

Once a federal statute of limitations has expired, it cannot be reinstated or resurrected by a later-filed state court action. *See Ferguson*, 321 F.3d at 822 ("section 2244(d) does not permit the reinitiation of the limitations period that has ended before the state petition was filed"); *Green v. White*, 223 F.3d 1001, 1003 (9th Cir. 2000) (petitioner was not entitled to tolling for state petitions filed after federal time limitation has run). Petitioner's further attempts to obtain post-conviction relief were filed after the statute of limitations expired and could not restart it. Moreover, each was determined to be procedurally improper and could not have tolled the statute of limitations.

## 4. Discussion of Equitable Tolling

If a petition is deemed untimely, a federal court can hear the claims if the petitioner can establish that "equitable tolling" should be applied. The petitioner must establish two elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace*, 544 U.S. at 418.

Ignorance of the law without more, is not grounds for equitable tolling. *Rasberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006) (a petitioner's "inability correctly to calculate the limitations period" and "lack of legal sophistication" are not "extraordinary circumstance[s] warranting equitable tolling")).

In limited circumstances, ineffective assistance of counsel can be grounds for equitable tolling if the petitioner shows (1) that post-conviction counsel acted not just negligently, but in an egregious manner, *see Holland v. Florida*, 560 U.S. 631, 249

(2010); (2) that the petitioner acted with reasonable diligence in continuing to pursue his rights, *see Pace*, 544 U.S. at 418; and (3) that there is a causal link between the action of counsel and the untimeliness of his federal petition, *see Spitsyn v. Moore*, 345 F.3d 796, 799 (9th Cir. 2003); *Randle v. Crawford*, 604 F.3d 1047, 1050 (9th Cir. 2010) ("the alleged negligence of Randle's counsel had little to no bearing on his ability to file a timely federal habeas petition").

Petitioner asserts that ineffective assistance of his post-conviction counsel Taber caused the untimeliness of his federal Habeas Corpus Petition  because Taber failed to properly represent him (failing to file a response to the notice of intent to dismiss) and failed to file a notice of appeal after dismissal of the original post-conviction matter. Dkt. 13, pp. 6-10. Here, for the sake of argument, the Court will assume that Petitioner can meet the standard for egregious behavior, given that counsel not only missed two deadlines, but counsel allegedly deceived Petitioner as to the status of the case (suggesting that the mistake was reparable and that counsel was going to address the damage, according to the hearsay statements in Petitioner's affidavit). These statements lulled Petitioner into believing that counsel was going to fix the error and that Petitioner did not have to do anything between 2011 and 2014. The Court will even assume, for the sake of argument that Taber's behavior was close to, or constituted, abandonment by counsel because Taber *did nothing* after stating or implying that, despite the dismissal order, he would use available procedural means to re-open or appeal Petitioner's case to permit further pursuit of his claims, and, thus, Petitioner should continue to rely on Taber as counsel of record. *See Maples v. Thomas*, 565 U.S. 266, 282-83 (2012) (procedural default context); *Gibbs v.*

*Legrand*, 767 F.3d 879, 885-886 (9th Cir. 2014) (extending *Maples* and attorney abandonment to equitable tolling context and observing that "failure to inform a client that his case has been decided, particularly where that decision implicates the client's ability to bring further proceedings and the attorney has committed himself to informing his client of such a development, constitutes attorney abandonment," *citing Mackey v. Hoffman*, 682 F.3d 1247, 1253 (9th Cir. 2012)).

However, Petitioner does not meet the second or third equitable tolling factor, which are related. Petitioner avers that Taber's communication with Petitioner dwindled from a slow dribble to a complete drought between 2011 and 2014. Taber visited with Petitioner about three times between July 2011 and April 25, 2012; one or two times between May 2012 and June 10, 2013; at least once from June 11, 2013; and "several times at the prison into 2014." State's Lodging C-1, p. 101. At some point in mid-2014, Taber stopped visiting Petitioner or accepting his phone calls. *Id.*

Even though Petitioner was relying on Tabor to reverse the dismissal via some viable legal avenue between 2011 and 2014, Petitioner clearly realized that Taber had abandoned him and his post-conviction matter by mid-2014. Petitioner's reliance on Taber during 2011 and 2014 became less and less well-founded, as Petitioner never received any document that Taber had filed with the Court, and apparently never requested one, for, if he had, he would not have received one.

Even though Petitioner originally began the post-conviction action pro se and thus knew how to file court documents, he took no court action in that case between 2014 and 2016. He vaguely states that he was trying to contact various private attorneys for advice,

without success. In January or February 2016, another inmate recommended that he contact criminal attorney Dennis Benjamin, who spoke to Petitioner the same month.[5] Benjamin told him that the time for appeal has passed. It was not until Petitioner spoke to Benjamin that he realized no work had been done on his case after Taber filed the motion for extension of time in 2011. *Id*.

Petitioner asked an inmate help him file a notice of appeal; that notice was filed June 24, 2016. State's Lodging C-1, pp. 60-61, 101.

This Court agrees with the state courts that Petitioner did not act diligently after discovering that his post-conviction petition had been dismissed. Prior to dismissal, the state district court mailed a Notice of Intent to Dismiss Post Conviction Relief Petition to Taber and Petitioner on May 17, 2011. Taber asked for an extension of time to respond, and, on June 2, 2011, an extension of 20 days was granted. State's Lodging C-1, pp. 53-55. Taber did not file anything within the extension period or at any time before the Court issued a dismissal order. *Id*., p. 58. The Court mailed Taber and Petitioner a copy of the Order Dismissing Post Conviction Relief Petition on November 4, 2011.  State's Lodging C-1, pp. 47-52, 58-59.

Petitioner's state court affidavit acknowledges that he received the order dismissing his post-conviction petition and he questioned Taber about the dismissal. *Id*., p. 82. From that point on, Petitioner was on notice of the seriousness of the status of his case. He did

---

[5] An envelope from Dennis Benjamin's firm which may have contained a copy of *Eby v. State*, 148 Idaho 731 (Idaho 2010), is dated 01/15//2016, showing that Petitioner likely made contact with Benjamin in January, not February 2016. The *Eby* Court held that "extraordinary facts" regarding an attorney's failure to work on a post-conviction case for the client may be grounds for Rule 60(b)(6) relief.

not act in a reasonably diligent manner when he did nothing even though he received no copies of any filings from Taber or orders from the court over the next year, two years, or three years.

Unfortunately, the law does not give a pro se petitioner a break for being unaware that his federal statute of limitations is running or when it will end. As set forth above, ignorance of the law and lack of legal sophistication do not alone constitute extraordinary circumstances warranting equitable tolling. *Rasberry*, 448 F.3d at 1154. Petitioner, like many other state prisoners, was placed in a problematic position where, on the one hand, federal law requires that a prisoner properly exhaust his federal claims in state court before coming to federal court, and yet, on the other hand, if prisoners remain in state court to try to exhaust federal claims when things go awry, they may find their federal statute of limitations has ended without regard to their efforts.

In addition, many prisoners simply cannot believe that the law would turn a blind eye toward a situation where a negligent attorney has lost the prisoner's only chance to put his post-conviction claims properly before the state court, and that there would be no legal avenue open for the petitioner to rectify that situation. Here, Petitioner was so astonished at several of his attorneys' courses of representation that his sole question to the Idaho Supreme Court in his last two appeals was a request to lay aside the untimeliness issue to permit his post-conviction matter to be heard. Even in the Rule 60(b) action, while the Idaho Supreme Court did not find Petitioner himself to be diligent, a factor which foreclosed relief, it also found that Petitioner had not submitted an amended petition, an

affidavit from Taber, or supporting documents—the absence of which was due, not to Petitioner himself, but to yet another layer of attorneys. See State's Lodging E-7.

However, stripping away what his lawyers have done and looking at only Petitioner's behavior, the Court concludes that once Petitioner knew that Taber had abandoned Petitioner and his case in mid-2014, Petitioner should have taken immediate steps to do *something* in *court*. Petitioner himself began the post-conviction action pro se, and thus clearly knew how to file documents in court or how to obtain assistance to do so. Diligence required Petitioner to contact the court immediately when Taber ceased communication. He could have asked the court to set a hearing, appoint another attorney, give Petitioner direction on what to do next, or just respond to a simple statement such as, "My attorney has abandoned me, and I don't know what to do." After a few unsuccessful calls to attorneys, Petitioner should have taken another course of action with the court, especially when he knew that appointment of counsel is done through the court, rather than wait two more years.

Third, even if the Court tolls the entire four-year period in which Taber was involved, Taber was not involved over the next two years, during which time the federal statute of limitations expired (after four years of tolling). There is no causation between Taber's actions and Petitioner's dilatory behavior during the final two years prior to filing the federal Petition. Therefore, Petitioner is not entitled to equitable tolling.

## 5. Discussion of Actual Innocence

The United States Supreme Court has determined that there is an "actual innocence" exception to the AEDPA statute of limitations that applies where a petitioner meets the

rigorous actual innocence standard of *Schlup v. Delo*, 513 U.S. 298 (1995). *McQuiggin v. Perkins*, 569 U.S. 383 (2013). "'Actual innocence means factual innocence, and not mere legal insufficiency.'" *Marrero v. Ives*, 682 F.3d 1190 (9th Cir. 2012) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

The evidence supporting the actual innocence claim must be "newly presented" evidence of actual innocence, meaning that "it was not introduced to the jury at trial"; it need not be "newly discovered," meaning that it could have been available to the defendant during his trial. *Griffin v. Johnson*, 350 F.3d 956, 962–63 (9th Cir. 2013).

To make a showing of actual innocence under *Schlup*, a petitioner must present new evidence showing that "'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *Perkins*, 569 U.S. at 400 (quoting *Schlup*, 513 U.S. at 327). This exception is to be applied only in the "extraordinary" or "extremely rare" case. *House v. Bell*, 547 U.S. 518, 538 (2006); *Schlup*, 513 U.S. at 320-21.

To show that he is actually innocent, Petitioner brings forward (1) police reports, photographs of the arrest scene, boot prints, boots, and other items that were available at the time of, but not admitted at, trial; and (2) a statement of an inmate, Tracey Hayes, who says that McDermott confessed to him. There are no allegations or evidence in the record that Petitioner's trial counsel did not have these items prior to trial. McDermott's Brahma boots and Petitioner's Stanley boots themselves were admitted at trial, but not the photos of the prints. State's Lodging A-3, p. 485. It appears that trial counsel simply chose not to use the additional items and information because trial counsel chose a different theory of defense—that McDermott was a dictatorial and dangerous leader, that McDermott killed

Street with the first shot, that both Hosford and Petitioner thought Street was dead before Petitioner fired the second shot, and that Petitioner had no premeditation or intention to kill Street. State's Lodging A-4, pp.1447-56.[6]

Petitioner now tells a long and complicated story to support his assertion of actual innocence: Petitioner's Stanley boot prints were not found near the body, but 30 feet away, while McDermott's Brahma boot prints were found near the body; Petitioner's leg was severely bruised previously in a professional fighting match, and he could not walk and was relying on a cane at that time; McDermott took Petitioner's cane away when they stopped in the desert, so Petitioner had to hop on one leg as they walked out into the desert; Petitioner was way behind the group of three men as they walked to the shooting site because Petitioner had to take time to gather himself after McDermott had attacked Petitioner after Petitioner had gotten out of the car; Hosford also used a cane at that time, and it was Hosford's cane that made the cane marks visible in the sand near the body; Petitioner caused a struggle with McDermott in the desert, begging him not to shoot Street, but McDermott shot Street during Petitioner's pleas; Petitioner tried to grab the gun from McDermott when McDermott held the gun close to Hosford's head to save Hosford after Hosford's refusal to shoot Street, but McDermott again attacked Petitioner, swiped his feet out from under him, shoved him to the ground, and said, "Fine, you're going to shoot Zach again and if you don't I'll have your kids killed," Dkt. 24, p. 2 (all of this done right where

---

[6] It appears that trial counsel rejected Petitioner's proposed defense that McDermott was responsible for Petitioner's actions. See State's Lodging A-5, pp. 14-15. Petitioner asked for new counsel during the pretrial phase because his counsel "don't understand brainwashing and mind control v. Holy Spirit association." *Id*. at 14.

Street was shot, yet, Petitioner contrarily says he was never closer than 31 feet and 9 inches from the body); Petitioner's confessions that he had fired the second shot to the detectives are untrue because, at that time, Petitioner could not remember what really happened because the "flashbang "or stun "grenade" that the SWAT team used to enter his residence temporarily damaged his memory ("When the detectives had finally talked to me my head and memory was all fuzzy and blurred together. Some things I was just confused about," Dkt. 24, p. 3), but over time, his memory came back; that Hosford had told other friends that he was not sure how many shots were fired and that McDermott shot more than once, State's Lodging A-5, pp. 11-14; and that McDermott told another inmate that McDermott himself fired both shots.

Petitioner realizes that his actual innocence theory is undone by his own admissions to police detectives, and that is why he now says that the "flashbang" or stun "grenade" erased his memory temporarily (accounting for the confessions) and then he gradually regained it (supporting his new story). Petitioner now contends that he was talking on the phone to his mother and heading down the hallway to the bedroom when the flashbang detonated. He says he somehow hit his head on something and landed *on the bed* but also that his footprints were burned into the carpeting, as depicted in a photo that, if it exists, he has not produced. He does not explain why there are no burns from the flashbang on Petitioner's feet or body in his photo exhibits, only bruising injuries from his earlier professional fighting match that caused him to have to use the cane. See State's Lodging A-4, pp. 631-33; 730-32.

Different from this description is SWAT team leader John Dwey's testimony at trial. Dwey testified that he opened the apartment with a key and his partner threw in a flashbang, which is a distraction device, down the hallway. He described it as "a really loud bang," an "excruciating sound." State's Lodging A-4, pp. 1390, 1393. He admitted it could cause some damage because it had a fair amount of explosive powder. *Id.*, p. 1392. He testified that, once the flashbang detonated, the SWAT team entered the apartment, turned directly into the first bedroom to the right, and found Petitioner and McDermott sleeping in the same bed. *Id.*, p. 1390. Dwey does not remember Petitioner having a phone in his hand, but testified he had no idea whether he did. *Id.*, p. 1394. McDermott and Petitioner did not resist arrest; they just lay on the bed and followed the commands. *Id.*, pp. 1394-95.

Petitioner says that Dwey is lying about Petitioner being found in bed "spooning" with McDermott, both in boxer shorts, because a photograph shows Petitioner lying on the bed wearing sweatpants. Dwey was asked about that discrepancy at trial, and he said: "I don't remember if those [pants] were on him or not. I thought they were in boxers. I remember them being in boxers. I don't remember those pants on him." *Id.*, p. 1391. It is possible that only McDermott was in boxers, because one of Petitioner's photos shows a pair of pants lying on the floor beside the bed. Dkt. 25, p. 3. Whether Dwey recalled the pants being on or off Petitioner is quite immaterial because Petitioner's story challenging his confessions is implausible—that he was caught in the flashbang, which wiped out his short-term memory, which somehow caused his version of events to detectives to match Hosford's.

MEMORANDUM DECISION AND ORDER - 20

Rather than telling detectives that he had no memory of events, Petitioner told them a set of very detailed facts in two interrogations over the first few days after the shooting: Petitioner told detectives there was no struggle, no horse play, and no scuffling after they got out of the car, but said, "I was just kinda jumping … think I was jumping around kinda by myself, just kinda being weird…being funny" to try to lighten the situation. State's Lodging A-8, p. 10. He told them that after the shooting, he wiped away his footprints in the sand. *Id.*, p. 11. In response to a question of why there were cane marks in the dirt, he told them he left his cane in the car, and Hosford brought his cane to the site of the shooting. State's Lodging A-7, p. 28 (the detective's responses seems to indicate that Hosford also had a cane but may have given it to Petitioner to use when they got out of the car, but Hosford's interrogation transcript has not been provided). Petitioner told detectives that he stood right next to Street, "looked down on his face," and then tried to shoot the gun in a direction "away" from Street's head, theorizing that if McDermott thought Petitioner also shot Street, it would relieve McDermott of worrying about Petitioner "ratting" on him. State's Lodging A-8, p. 18.

Perhaps Petitioner's memory-impaired version of events matched much of Hosford's confessions because detectives recounted Hosford's story to Petitioner before they let him speak, but it seems more likely that someone who had no memory would say only, "I have no memory since the flashbang detonated." Petitioner and Hosford corroborated each other. Both described the manner in which McDermott taunted Street by placing the gun against different parts of Street's head, covered by his shirt, and making Street identify the part of his head that was in contact with the gun. Both men described

the abrupt manner in which McDermott shot Street. Petitioner and Hosford said that, after the first shot, McDermott offered the gun to Hosford, and Hosford refused to take it, but then Petitioner took it and fired a shot.

Petitioner and Hosford both admitted that they were in a secret gang called "La Familia" led by McDermott, that McDermott frequently spoke with an Italian accent and had an Italian sounding alias, that Petitioner frequently spoke with a German accent and had a German sounding alias, and that Petitioner and McDermott dressed in matching leather jackets, black OTB pants, and black leather gloves that night. Both Petitioner and Hosford revealed that McDermott had told them and others that he was going to kill Street for ratting on him after Street's earlier arrest for theft. Both Petitioner and Hosford told similar stories of what they did after the shooting, including washing the dirt off their boots. Compare State's Lodging A-4, pp. 639-666 (Hosford trial testimony) with State's Lodgings A-7 and A-8 (Petitioner's two interrogations with detectives).

The evidence found at the scene matched Hosford's and Petitioner's similar facts. There were two shots through Street's head and two bullet casings found near the body.[7] Even after Petitioner had tried to wipe away his footprints, Sergeant Roberson found four sets of footprints.[8] Dkt. 24, p. 10.

---

[7] The second shot was in the middle of the head, not in a place that suggested Petitioner tried purposely to miss the head, as he told detectives. State's Lodging A-4, pp. 577-582. The medical expert testified that Street may have lived for several more hours had he not been shot the second time. *Id.*, p. 582.

[8] Because Petitioner had wiped away most of his footprints, Gardner reported: "It appeared that at least two people accompanied Zachary to the location of the shooting" and "[a]t the location where the body was found, I observed three sets of footprints. One set appeared to be consistent with stockinged feet." *Id.*, p. 9. Given the other evidence in this case, the presence or absence of Petitioner's footprints near the body does not mean that Petitioner is actually innocent.

Petitioner may have developed his new actual innocence story by studying the police reports and trying to match their contents. Before Petitioner had a chance to review the police reports, during interrogations, investigators asked Petitioner several times whether a scuffle had occurred. Petitioner responded only that he was jumping around to amuse the other three men before they walked into the desert. After Petitioner read the police reports that described a grassy area with matted grass and dropped coins that appeared to be the site of a struggle, Petitioner added to his story two attacks upon him by McDermott and one scuffle caused by Petitioner attempting to dissuade McDermott from shooting Street. See Dkt. 13; Dkt. 24, p. 9.

The last of Petitioner's actual innocence story is a jailhouse informant chapter. Petitioner shows that an inmate, Tracey Hayes, reported that he heard McDermott "bragging that he had fired both shots." Dkt. 23-2, pp. 11-18. McDermott allegedly said he had to fire both shots "because his two co-defendants were scared cowards." Dkt. 23-2, p. 14 (discussing Dkt. 25, pp. 6-10). The actual report Petitioner has attached does provide this information, but also provides the following: Hayes said, "whether McDermott was the only one that pulled the trigger, he did not know." Dkt. 25, p. 9. Even when discussing whether McDermott filed two shots, Hayes said, "I'm not sure." *Id*., p. 10.

The Court agrees that, without other reliable corroborating evidence, the testimony of incarcerated witnesses "is inherently unreliable." *Sivak v. Hardison*, 658 F.3d 898, 916 (9th Cir. 2011). Such testimony should be given little weight. *Gaytan v. Collier*, 2020 WL 9211233, *16 (S.D. Tex. 2020) ("[j]ailhouse-witness testimony is inherently unreliable due to the inmate's incentive to better his circumstances" (citation omitted). Jailhouse

informants are common, so common that another such a person, Jared Smith, came forward to contradict Hosford's testimony, which was refuted by Hosford at Petitioner's sentencing hearing. State's Lodging A-5, pp. 105-07.

The entire record, including the "new" evidence, shows that Petitioner is guilty as convicted. As to his knowledge of, acquiescence in, and participation in the crime, the sentencing court aptly noted that *what* Petitioner chose *before firing the second shot* demonstrates his intent: "[W]hen you took the gun from Mr. McDermott, at that point, you were in charge. You and Hosford could have left." State's Lodging A-5, p. 131.

Petitioner has not met his burden of establishing actual innocence as a legal excuse for his untimely filing. Adding Petitioner's new evidence to the mix does not establish that no reasonable juror would have convicted him. Rather, Petitioner's story of actual innocence is self-contradictory and also contradicts his prior confessions; moreover, his supplemental story that he gave untruthful prior confessions due to a memory-impaired status is simply implausible based on the detailed and corroborated content of the confessions and the lack of any physical injury from the flashbang. The United States Supreme Court has observed, "a "confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). While a confession does not foreclose an actual innocence claim, when corroborated by other evidence, as here, it is very probative and damaging.

### 6.  Conclusion

Petitioner missed his statute of limitations. Petitioner knew that his original post-conviction action was dismissed in 2011. Because he did nothing to check in with the state court after it was clear that Taber had abandoned the post-conviction matter by 2014, and he waited until 2016 to file something with the court, he has not shown diligence that would permit equitable tolling to be applied. The entire record makes it clear that Petitioner is not actually innocent. The Court does not reach Respondent's procedural default argument because dismissal on timeliness grounds is clearly warranted. To the extent that the parties otherwise have made arguments that the Court does not specifically include in its Order, they are rejected. This case will be dismissed with prejudice, and a certificate of appealability will not be issued.

**ORDER**

**IT IS ORDERED:**

1. The parties' Motions for Leave to File Excess Pages (Dkts. 23, 28) are GRANTED.

2. Respondent's first Motion to Dismiss (Dkt. 10) is DENIED as MOOT.

3. Petitioner's Motion to Reconsider Dismissal (Dkt. 14), construed as a notice of intent to prosecute this case, is GRANTED, only to the extent that the Court considered Petitioner's Amended Petition (Dkt. 13).

4. Respondent's Motion to Extend Time to File Answer (Dkt. 18) is GRANTED.

5. Respondent's second Motion to Dismiss (Dkt. 21) is GRANTED. Petitioner's case is DISMISSED with prejudice.

6.  The Court will not grant a Certificate of Appealability in this case. If Petitioner

    chooses to file a notice of appeal, the Clerk of Court is ordered to forward a copy of

    this Order, the record in this case, and Petitioner's notice of appeal, to the United

    States Court of Appeals for the Ninth Circuit.

DATED: March 31, 2023

David C. Nye
Chief U.S. District Court Judge